John DOE, Plaintiff,

v.

Dr. Henry C. LEE, et al., Defendants.

No. 3:99CV0314 (RNC).

United States District Court,
D. Connecticut.

March 31, 2001.

Shelley R. Sadin, Zeldes, Needle & Cooper, Bridgeport, CT, Philip D. Tegeler, Connecticut Civil Liberties, Union Foundation, Hartford, CT, for plaintiffs.

Lynn D. Wittenbrink, Attorney General's Office, Margaret Quilter Chapple, Attorney General's Office, Employment Rights, Hartford, CT, for defendants.

## RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

CHATIGNY, District Judge.

Plaintiff brings this action challenging the constitutionality of the Connecticut sex offender registry act ("CT–SORA"), which requires registration by, and public disclosure of information concerning, persons designated as "sexual offenders." Plaintiff claims that the statute, commonly referred to as Connecticut's Megan's Law, deprives him of a protected liberty interest in violation of the Fourteenth Amendment's Due Process Clause and, as applied to him, violates the Constitution's Ex Post Facto Clause. Cross-motions for summary judgment have been filed on potentially dispositive legal issues regarding liability.[1] The parties agree that two issues can be decided on the record presented at this stage: (1) whether the CT–SORA imposes a "stigma" on registrants for purposes of the "stigma plus" test used to establish a liberty interest protected by the Due Process Clause; and (2) whether the statute violates the Ex Post Facto Clause.[2]

Plaintiff's motion for summary judgment on the due process claim is granted essentially because the undifferentiated nature of the registry stigmatizes nondangerous registrants by grouping them together with dangerous registrants.[3] Plaintiff alleges that he is not dangerous; the registry system alters his legal status (thereby satisfying the "plus" element of the stigma plus test); and the State provided no procedure to determine whether plaintiff is currently dangerous before including him in the registry. Defendants' motion for summary judgment on the ex post facto claim is granted because the legislature did not enact the CT–SORA with punitive intent and the law's effects are not so punishing as to render it punitive in fact. Because the parties have not yet addressed remedies, no ruling is made as to remedy at this time.

### Background

#### A. The Statutory Scheme

In 1998 and 1999, the Connecticut legislature revised the State's version of Megan's Law in ways that spawned this lawsuit. See Public Acts No. 98–111 & 99–183 (codified at C.G.S. §§ 54–250 to –261) (collectively referred to as the "CT–SORA").[4]

#### Registration Obligations

Under the CT–SORA, persons who have been convicted or found not guilty by reason of mental disease or defect of enumerated offenses must register with the

---

1. Plaintiff's Fourth Amended Complaint contains class action allegations as to both claims. The parties agree that class certification issues should not be decided until after the issues presented by the cross-motions are resolved.

2. Plaintiff contends that the remaining aspects of the due process claim can be decided at this time as well. Defendants disagree.

3. By undifferentiated I mean a system like Connecticut's, which places all registrants in one class for notification purposes—"sex offender"—without attempting any individualized assessment of their dangerousness or likelihood of reoffense. One commentator has termed systems without individualized risk assessment "compulsory" registries and has calculated that nineteen states have adopted such systems. See Wayne A. Logan, *A Study in "Actuarial Justice": Sex Offender Classification Practice and Procedure*, 3 Buff.

*Crim. L.Rev.* 593, 603 (2000). The remaining states and the District of Columbia use approaches that involve the exercise of varying degrees of discretion on the part of classifying authorities. See *id.* at 606–19. An example of a differentiated, or classified, system is New York's three-tier system, described in *Doe v. Pataki*, 120 F.3d 1263, 1266–70 (2d Cir.1997).

4. Federal law conditions a state's receipt of certain federal law enforcement grants on the creation of a sex offender registry program. See 42 U.S.C. § 14071. Among other things, a state must register persons convicted of certain offenses and provide the information to the F.B.I. and local law enforcement. The federal law requires that the information be released to the extent necessary to protect the public from specific individuals but does not require a state to apply its program retroactively.

Commissioner of Public Safety ("Commissioner") within three days of their release into the community. All registrants must provide the same information: name, residence address, criminal history record, fingerprints, a photograph, and a description of such other identifying characteristics as the Department of Public Safety ("DPS") requires (such as scars and tattoos). If a registrant moves, he must notify the Commissioner in writing of the new address within five days.[5] Registrants must also complete and return address verification forms sent to them by the Commissioner and submit to the retaking of a photograph at least every five years. Failure to comply with the requirements of the CT–SORA is a class D felony, punishable by up to five years in jail.

The statute applies to persons convicted of four types of offenses: criminal offenses against a victim who is a minor; nonviolent sexual offenses; violent sexual offenses; and felonies committed for sexual purposes. The burdens imposed on registrants vary depending on the type of offense committed. Some offenders are ob-

ligated to maintain their registrations for life,[6] while others must do so for ten years.[7] Registrants must complete and return address verification forms either annually[8] or every ninety days.[9]

The DPS is required to maintain a central registry of the information submitted by sex offenders. On receipt of an individual's information, the DPS is required to provide it to local law enforcement officials with jurisdiction over the registrant's address.[10]

*Public Disclosure*

The DPS must make the registry available to the public in a number of ways.[11] First, the central registry maintained at the DPS must be available to the public during regular business hours. Second, local law enforcement agencies must make the information that DPS has transmitted to them available during business hours. Third, the DPS is required to make the registry information available over the Internet. Finally, the DPS must annually remind the state's media that the registry exists and provide them with information

5. If the registrant moves to another state, he must contact and register with any sexual offender registry agency in the other state. Similarly, if a registrant regularly travels to or temporarily resides in another state, he must inform the Commissioner and notify the registry agency in the other state.

6. Life registrants include persons who were required to register under the pre–1998 version of the CT–SORA; persons who have committed violent sexual offenses; and persons who have committed a second criminal offense against a minor or nonviolent sexual offense.

7. Ten-year registrants include persons convicted for the first time of an offense against a minor or a nonviolent sexual offense, as well as persons who have committed a felony for a sexual purpose.

8. Persons who have committed offenses against a minor, nonviolent sexual offenses, or felonies with sexual purposes are subject to annual verification.

9. Persons who have committed violent sexual offenses must return forms every ninety days.

10. If the registrant's address is in another state, the DPS must provide the information to the registry agency in the other state. *See* C.G.S. § 54–257(a). For all registrants, the DPS must transmit all registration information, conviction data, photographs, and fingerprints to the F.B.I. *See id.*

11. The CT–SORA does not require proactive community notification regarding any registrant's information. However, "[a]ny state agency, the Judicial Department, any state police troop or any local police department may, at its discretion, notify any government agency, private organization, or individual of registration information when such agency, said department, such troop or such police department, as the case may be, believes such notification is necessary to protect the public or any individual in any jurisdiction from any person who is subject to registration." *See* C.G.S. § 54–258(a)(2). The CT–SORA provides no guidelines for how these entities are to exercise their discretion.

on how it can be accessed. *See* C.G.S. § 54–258(a)(1).

An uncodified provision of P.A. 99–183 requires that any dissemination of the registry be accompanied by the following warning: "Any person who uses information in this registry to injure, harass or commit a criminal act against any person included in the registry or any other person is subject to criminal prosecution." P.A. 99–183 § 10.

*Exemption, Limitation, or Suspension of Registration*

Two narrow classes of offenders may be completely exempted from the obligation to register if a court finds that registration is not necessary to protect the public. *See* C.G.S. § 54–251(b), (c).[12]

The registry data of select other offenders may be restricted by court order to use for law enforcement purposes only.[13] For any of these offenders, the court may enter an order restricting dissemination of registry information only after finding that public safety does not require general public access to the information.

Finally, a person's registration is suspended if he becomes incarcerated or civilly committed or takes up residence in another state. *See* C.G.S. § 54–257(b).

### B. *Additional Undisputed Facts*

The DPS has a procedure in place to respond to challenges to the accuracy or completeness of registry information, but otherwise has no discretion in determining whether individuals must register. Moreover, none of the agencies involved in the registration process (i.e., the DPS, the Department of Corrections, or the Office of Adult Probation) conducts any individualized assessment of the public safety threat posed by an individual when deciding whether he must register.

### C. *The Web Site*

The DPS Sex Offender Registry web site permits any Internet user visiting the site to search and display the information contained in the registry database. The database can be searched by last name, the first letter of a last name, a town name, or a zip code. Searching by a town or zip code provides a list of the names of all registrants living in that area.

Clicking on a listed name brings up a web page entitled "Registered Sex Offender." If the registrant has complied with the CT–SORA's requirements, there have been no technical difficulties, and the DPS has had time to process and post the registrant's information, this page contains the registrant's name, offense, current residence address, physical description and photograph.

At the time the parties filed their briefs, the front page of the web site included the following language:

> This information is made available for the purpose of complying with Connecti-

---

12. Persons convicted of fourth-degree sexual assault for subjecting another person to sexual contact without consent are eligible for exemption, as are persons who were under 19 at the time of their offense and were convicted of having sexual intercourse with someone who was (1) more than two years younger than they and (2) between the ages 13 and 16 at the time of the offense.

13. There are two ways an offender's information can become restricted. First, when the registrant's offense is sexual assault in a spousal or cohabitating relationship, *see* C.G.S. 53a–70b, or an offense against a person who, at the time of the offense, was under 18 and living in the registrant's household, the court can restrict access to law enforce-

ment if it finds that public dissemination would likely reveal the identity of the victim. *See* C.G.S. § 54–255(a).

Second, certain registrants are entitled to petition for such an order. This right of petition is available to (1) registrants who committed specific offenses between October 1, 1988, and June 30, 1999, regardless of their sentence or subsequent criminal history; and (2) any registrant convicted between October 1, 1988, and September 30, 1998, of any offense requiring registration if he served no jail time as a result of the conviction, has not been subsequently convicted of an offense that requires registration, and has been registered with the DPS as required by the CT–SORA. *See* C.G.S. § 54–255(c).

cut General Statutes § 54–250 *et seq.*, which requires the Connecticut Department of Public Safety to establish and maintain a registry of persons who are required to register under sections 54–250 through 54–254 of the General Statutes. Those statutes require that certain individuals be included in the registry because of their conviction or finding of not guilty by reason of mental disease or defect of a specified criminal offense and subsequent release into the community on or after October 1, 1988. The registry is based on the legislature's decision to facilitate access to publicly-available information about persons convicted of sexual offenses. The Department of Public Safety has not considered or assessed the specific risk of reoffense with regard to any individual prior to his or her inclusion within this registry, and has made no determination that any individual included in the Registry is currently dangerous. Individuals included within the registry are included solely by virtue of their conviction record and state law. The main purpose of providing this data on the Internet is to make the information more easily available and accessible, not to warn about any specific individual. Anyone who uses this information to injure, harass, or commit a criminal act against any person included in the registry or any other person is subject to criminal prosecution.[14]

### D. *The Plaintiff*

Plaintiff is required to register under the CT–SORA. He alleges in the Fourth Amended Complaint that he is not a dangerous sexual offender and does not pose a threat to the safety of the community. Defendants contend that all the information on the CT–SORA web site regarding plaintiff is accurate and that he provided the information regarding his birth date, address, physical description, criminal offenses, and other identifying information. Plaintiff does not contend that any piece of data is inaccurate.

### *Discussion*

#### I. *Due Process Claim*

■ Plaintiff claims the CT–SORA violates the Due Process Clause of the Fourteenth Amendment. To succeed on this procedural due process claim, plaintiff must demonstrate (1) that the CT–SORA deprives him of a constitutionally protected liberty interest; and (2) that the procedures attending the deprivation are inadequate. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). To establish a protected liberty interest, plaintiff must satisfy the "stigma plus" test applied in the Second Circuit. *See Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994); *Doe v. Pataki*, 3 F.Supp.2d 456, 467 (S.D.N.Y. 1998).

■ Plaintiff prevails on the due process claim because the State has not provided him with any opportunity to challenge the stigmatizing allegation, implied by his inclusion in the publicly available registry, that he is a dangerous sex offender. The implied allegation, which plaintiff contends is false, arises from the undifferentiated nature of the registry, in which dangerous and nondangerous registrants are grouped in a single classification and no information is provided regarding any registrant's dangerousness. Because there can be no doubt that some registrants are dangerous, Connecticut's single classification falsely suggests that nondangerous registrants are a threat to public safety. In addition to falsely stigmatizing nondangerous registrants, the CT–SORA alters their legal status under state law.[15]

---

**14.** Since the briefs were filed, the DPS has modified the format of the front page and the language quoted in the text no longer appears as a single paragraph; however, the sub-

stance of the quoted paragraph remains on the front page.

**15.** Defendants suggest that the undifferentiated nature of the registry requires rejection of

## A. *Stigma*

Plaintiff first must prove that his "inclusion in the [publicly disseminated sex offender registry] will result in stigma, that is, in 'public opprobrium' and damage to [his] reputation." *Valmonte*, 18 F.3d at 999 (quoting *Bohn v. County of Dakota*, 772 F.2d 1433, 1436 n. 4 (8th Cir.1985)). Plaintiff contends that he is stigmatized because his inclusion in the registry conveys the false message that he is a dangerous sex offender and a threat to public safety. Defendant contends that the registry sends no message about a registrant's dangerousness and communicates only the admittedly accurate information that plaintiff has been convicted of a crime requiring registration.

■ When, as here, a plaintiff seeks not damages but rather an opportunity to be heard in order to establish that a communication about him is false, the plaintiff need only allege—not prove—that the communication at issue is not true. *See Brandt v. Board of Co-op. Educ. Servs.*, 820 F.2d 41, 42–44 (2d Cir.1987) (citing *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (finding plain-

tiff's action for name-clearing hearing fatally deficient because of failure to contend that employer's communication was false)).[16] Accordingly, to establish that the CT–SORA implicates a liberty interest, plaintiff must establish that the charge against him is stigmatizing, that he alleges it to be false, and that a plus factor is present. Plaintiff satisfies the allegation-of-falsity element by the amendment to his complaint approved today in a separate order. *See* Fourth Am. Compl. ¶ 4.

■ The stigma question thus becomes whether, assuming plaintiff is not dangerous, public dissemination of the sex offender registry conveys the erroneous message that he is. The answer to this question must be yes. Despite the accuracy of the registry data concerning the plaintiff and the statement on the web site that no determination of any individual's dangerousness has been made, the registry suggests that plaintiff is currently dangerous. Specifically, the undifferentiated nature of the registry and the undisputed purposes of the CT–SORA make it reasonable for a viewer of the registry to conclude that any particular registrant is dangerous.[17]

plaintiff's due process claim because a hearing would not serve any useful purpose. *See, e.g.*, Defs.' Mem. at 20–21, 30–31. However, the fact that a particular jurisdiction's registration and notification scheme does not differentiate among offenders, and thus relies exclusively upon blanket legislative assessment of community danger, should not alter the liberty interest analysis. The constitutional question is not whether offender differentiation is contemplated by the particular statutory scheme in question; rather, it is whether a liberty interest exists sufficient to warrant due process protection.
Wayne A. Logan, *Liberty Interests in the Preventive State; Procedural Due Process and Sex Offender Community Notification Laws*, 89 J.Crim. L. & Criminology 1167, 1210–11 (1999).

16. *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir.1991), which states that "plaintiff must establish that the information was stigmatizing, false, and publicized by the state actor," is not to the contrary. *Kelly Kare* cited *Brandt* as the primary authority for the

quoted proposition and indicated no disagreement with the distinction made by *Brandt* between actions for damages and actions seeking a name-clearing hearing. While the *Kelly Kare* plaintiff did seek an injunction, the decision in that case did not turn on whether the plaintiff had alleged or proven falsity. Rather, the court found that, because the county had been silent as to the reason for its termination of Kelly Kare's contract, there was no communication that could be seen as stigmatizing or false.

17. Plaintiff contends that the registry's availability on the Internet is by itself an additional contextual factor that conveys the message that registrants are dangerous. Governmental use of the Internet to disseminate information is now commonplace, however, and no special message should be associated with the registry simply because it can be accessed via the Internet. Adopting plaintiff's position would prohibit the State from taking information that is already publicly available in its compiled form and making it more readily available.

The stated purposes of the CT–SORA are to protect the public and facilitate law enforcement.[18] Registration and dissemination serve these goals only because some registrants are likely to reoffend. Thus, the message that some registrants are currently dangerous is, and is intended to be, communicated to viewers of the registry.

A person viewing any one registrant's information is told that the State has not assessed the registrant's risk of reoffense and has not determined whether he is currently dangerous. While it is true, then, that the viewer has no reason to think the registrant is one of those who is dangerous, the viewer also has no reason to think the registrant is not dangerous. Because there is no classification system, the viewer has neither absolute nor relative information regarding the dangerousness of the registrant. Without such information, the viewer could reasonably conclude that the registrant is likely to reoffend.

Defendants do not dispute that within the group of persons required to register as sex offenders there is significant variation in the likelihood of particular offenders committing another "sex offense." [19] This variation is presumably the reason why other states have adopted a tiered registry and notification system, under which sex offenders are subgrouped according to their individually assessed risk of reoffense. *See Doe v. Pataki,* 3 F.Supp.2d 456, 462 (S.D.N.Y.1998) (describing the New York system, which has low-, moderate-, and high-risk classes). In a tiered system, a recipient of a registrant's information can discern the dangerousness of that registrant relative to the universe of sex offenders. By omitting to provide such relative information, Connecticut's system has the effect of falsely suggesting that nondangerous registrants are in fact dangerous.[20]

### B. *Plus Factors*

Damage to reputation, without more, is insufficient to establish a liberty interest protected by the Due Process Clause. The stigmatizing conduct must be accompanied by some tangible injury or material alteration of legal right or status. *See Paul v. Davis,* 424 U.S. 693, 701, 708, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Valmonte,* 18 F.3d at 999–1000. Plaintiff satisfies this plus element because the registration requirements of the CT–SORA alter his legal status under state law.

The CT–SORA requires registrants to appear at the Department of Public Safety to register or undergo registration processes before their release from incarceration. For at least ten years after that, and possibly for life, a registrant must maintain his registration by completing forms periodically mailed to him by the Department and appearing at the DPS to have his photograph taken at least every five years. During his registration period, a registrant must promptly inform the DPS any time he moves or if he regularly travels to or temporarily resides in any other state. If a registrant does move to, regularly travel to, or temporarily reside in another state, he must ascertain if that state has a registration agency and wheth-

---

**18.** Defendants contend that these are the statute's purposes. Plaintiff has provided numerous news articles supporting his contention that the State has contributed to public understanding of these purposes through statements made by the Governor, legislators, the Commissioner, and other officials.

**19.** This is particularly true for the Connecticut system, under which some of the "sex offenses" do not require any sexual conduct by the registrant. These nonsexual sex offenses include various degrees of kidnapping and unlawful restraint when the victim is under 18. While these offenses are classified by the statute as criminal offenses against a minor rather than as violent or nonviolent sexual offenses, registrants convicted of these offenses are still grouped under the label "sex offender."

**20.** *Cf. Doe v. Pryor,* 61 F.Supp.2d 1224, 1231 (M.D.Ala.1999) (noting that community notification "strongly implies that [a registrant] is a likely recidivist and a danger to his community.")

er he is required to register with it; if that is the case, he must then perform whatever acts are required to comply with the other state's registry program. Failure to comply with any of the registration requirements is a Class D felony, punishable by imprisonment for up to five years.[21]

Defendants counter with two arguments: first, that the registration requirements are incidental, regulatory burdens, which cannot satisfy the plus element; and, second, that the registration burdens do not measure up to the type of deprivation of a right that the Second Circuit has previously held to be a plus factor.

Defendants' first line of argument misses the mark. The burdens on registrants are significantly more extensive than simply providing change of address information, which is how defendants characterize them. Moreover, while courts have found registration requirements to be regulatory and nonpunitive—and therefore not an affirmative disability or restraint for ex post facto purposes—it does not follow that such requirements do not alter a registrant's rights or status under state law.

Defendants' second argument, which suggests that the plus factor can come only from a deprivation of employment closely linked to the stigmatizing conduct, is also unavailing. Courts have held that the alteration of legal status and the burdens accompanying registration under a sex offender law satisfy the plus element. *See Doe,* 3 F.Supp.2d at 468; *W.P. v. Poritz,* 931 F.Supp. 1199, 1219 (D.N.J. 1996); *Doe v. Attorney General,* 430 Mass. 155, 715 N.E.2d 37, 43 (1999) (interpreting the Massachusetts Constitution).[22] Moreover, while *Valmonte v. Bane* and other

Second Circuit cases finding stigma-plus arise in the employment context, *Valmonte* recognizes that none of those cases "foreclosed the possibility that the 'plus' element could come from some other independent deprivation." *Valmonte,* 18 F.3d at 1002. *Valmonte* requires that the plus factor come from a "tangible burden" separate from the "deleterious effects which flow directly from a sullied reputation." *Id.* at 1001. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), speaks generally of the alteration or deprivation of a legal right or status under state law, *see id.* at 711–12, 96 S.Ct. 1155, and identifies (without using the term) the plus factor in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), as the loss of the right to buy alcohol, which has no direct connection with employment, *see id.* at 708–09, 96 S.Ct. 1155.

The burdens imposed by the CT–SORA may entail greater infringement on personal liberty than the type of deprivation at issue in employment cases. In those cases, the government statute, policy, or statement does not mandate any future action by the target of the defamation. Rather, the plus factor is generally satisfied by a one-time event that has already occurred, such as dismissal from an existing job or preclusion from another job. The CT–SORA, on the other hand, requires nondangerous registrants to repeatedly take specific actions to facilitate the government's ongoing defamatory communications. This is no small matter. As the Massachusetts Supreme Judicial

---

**21.** Relying on my ruling in *Doe v. DPS,* No. 3:99CV135, slip op. (D.Conn. Mar. 9, 1999) and on *Doe v. Pataki,* 3 F.Supp.2d at 468, plaintiff argues that these requirements constitute an alteration of legal status sufficient to satisfy the plus element. The obligations imposed by the CT–SORA as just described are more burdensome than they were when I ruled in *Doe v. DPS* and in their current form are more burdensome than the ones described in *Doe v. Pataki.*

**22.** *Doe v. Pryor,* 61 F.Supp.2d 1224 (M.D.Ala. 1999), also found a plus factor in the burdens of a sex offender statute, but those burdens went beyond the CT–SORA's registration requirements to include prohibitions on living or working within 1000 feet of a school or day care center, residing with a minor child not the registrant's biological or adopted child, and changing one's name. *See id.* at 1227.

Court has noted, registration under a sex offender statute is

> a continuing, intrusive, and humiliating regulation of the person himself. To require registration of persons not in connection with any particular activity asserts a relationship between government and the individual that is in principle quite alien to our traditions, a relationship which when generalized has been the hallmark of totalitarian government.

*Doe v. Attorney General,* 430 Mass. 155, 715 N.E.2d at 43. Because the registration requirements alter the offenders' status under state law, they satisfy the plus element and plaintiff has thus established that the registry's "allegation" that he is dangerous implicates a liberty interest protected by the Fourteenth Amendment.[23]

### C. The Process that is Due

■ Having determined that dissemination of the undifferentiated registry deprives nondangerous registrants of a constitutionally protected liberty interest, I turn to consider whether the procedural safeguards provided by the State are adequate. Due process requires, at a minimum, notice and an opportunity to be heard. *See Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Beyond that, the amount of process due is generally determined under the framework of *Mathews v. Eldridge.* In this case, it is not necessary to engage in the *Mathews* balancing because it is undisputed that the CT–SORA provides no procedure to determine a person's dangerousness before he is included in the registry. It suffices to say that under the Connecticut system nondangerous registrants do not have an adequate opportunity to be heard before the deprivation of their liber-

ty interest and thus are denied their Fourteenth Amendment right to due process.

### II. *Ex Post Facto Clause*

■ Plaintiff's claim based on the Ex Post Facto Clause presents the question whether the CT–SORA imposes a penal sanction. The Ex Post Facto Clause forbids application of a new penal sanction to a crime that has already been committed. *See Kansas v. Hendricks,* 521 U.S. 346, 370, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *Doe v. Pataki,* 120 F.3d 1263, 1272 (2d Cir.1997) (hereinafter *"Doe"*). The Second Circuit has established a two-part test to determine whether a law is penal: first, whether the legislature intended the statute to be criminal or civil; and, second, if the intent was nonpunitive, whether the statute is so punitive in fact that it cannot legitimately be seen as civil in nature. *See Doe,* 120 F.3d at 1274–75. The features of the CT–SORA on which plaintiff primarily relies (namely, widespread dissemination of registration information with no individualized assessment of dangerousness) make this a somewhat closer case than recent cases in which the Second Circuit rejected ex post facto claims. *See Doe; Roe v. Office of Adult Probation,* 125 F.3d 47 (2d Cir.1997). However, I agree with the defendants that the CT–SORA is regulatory in both intent and effect. Accordingly, their motion for summary judgment on the ex post facto claim is granted.

### A. Legislative Intent

Public Acts 98–111 and 99–183 are not Connecticut's first enactment of Megan's Law; they are follow-on statutes to an earlier version. The Second Circuit has stated that the earlier version was enacted in response to concerns "regarding the harm to society caused by sex crimes and

---

**23.** Plaintiff contends that the stigmatizing conduct denies a protection of reputation guaranteed by Article I, § 10, of the Connecticut Constitution, will have negative effects on the employment prospects and family relationships of registrants, and will likely result in harassing and abusive attacks on registrants. Because the burdens of the registration requirements constitute a plus factor, there is no need to address these other alleged consequences of the CT–SORA.

the relatively high rate of recidivism among sex offenders." *Roe*, 125 F.3d at 48. The Connecticut Supreme Court has expressly agreed with the Second Circuit's characterization. *See Connecticut v. Misiorski*, 250 Conn. 280, 738 A.2d 595, 601–602 (1999). Given the nonpunitive purpose of the prior law, plaintiff can succeed on his ex post facto claim only if he demonstrates that the legislature acted with punitive intent when it amended the prior law or that the new regime it created is punitive in fact.

 The legislature's intent, which can be either express or implied, *see Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citing *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)), is determined by considering the law's legislative history, its text (including any preamble), and its structural features. *See Doe*, 120 F.3d at 1276–78. The limited legislative history materials the parties have provided, which are somewhat informative on the issue of intent, do not establish that the legislature abandoned its nonpunitive purpose.[24] Plaintiff makes no claim that the text of the law manifests a punitive intent, and there is nothing in the

text that suggests the legislature sought to punish sex offenders rather than protect public safety.[25] That leaves the statute's structural features.

 Several features of the law clearly support a nonpunitive, public-safety orientation: (1) an offender is not required to register, and thus no information can be made publicly available, until the time of his release, *cf. Doe*, 120 F.3d at 1278 (noting that the offender's assessment is not done until just before release); (2) any public dissemination of registry information must provide a warning that anyone who uses the information to harass a registrant is subject to criminal prosecution; (3) while the class of registrants eligible to petition to be relieved of the registration or notification burdens is narrower than in other systems, the burden on those eligible to petition is to show that they are not a danger to the public; and (4) an offender's registration is suspended when he is in jail or living out of the state and thus does not present a danger to Connecticut residents.

On the other hand, the CT–SORA differs from the statute in *Doe* and the policy in *Roe* in the following ways: (1) the amount of information about a registrant that is revealed, and the way in which it is

24. In general, comments of individuals involved in the legislative process do not provide a sure basis for determining legislative purpose. *See Doe*, 120 F.3d at 1277 (noting that "floor debates are of particularly limited assistance in resolving highly controversial issues of legislative intent"). The views expressed by a law's sponsors, however, are entitled to greater weight than those of other commentators. *See id.* Defendants present the Connecticut House Judiciary Committee testimony of Michael Cicchetti, Undersecretary of the Office of Policy and Management ("OPM"), introducing P.A. 99–183, who stated that the purpose of the registry law is to "make it possible for the public to protect itself" and not to impose "additional punishment for [sex] offenders." OPM was one of the many government agencies that participated in a committee established by P.A. 98–111 to monitor the implementation of P.A. 98–111 and to recommend amendments. The bill Cicchetti introduced contained those recommendations, and he can be regarded as

speaking on behalf of the bill's sponsors. The floor statements of the sponsors of both bills and their answers to questions, viewed as a whole, also show that the law's purposes are to protect the public and facilitate law enforcement.

Plaintiff cites statements by other legislators, who recognized the detrimental effects on an offender's life that are incidental to registration and notification. Those citations do not establish that those legislators or any others acted for the purpose of bringing about such effects. As in *Doe*, plaintiff here has failed to produce legislative history that provides the " 'unmistakable evidence of punitive intent' required to demonstrate punitive motivation." *Doe*, 120 F.3d at 1277 (citing *Flemming v. Nestor*, 363 U.S. 603, 619, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

25. Neither P.A. 98–111 nor P.A. 99–183 contains any preamble or statement of purpose to assist in resolving this question of legislative intent.

revealed, is not linked to any individualized assessment of the registrant's dangerousness; (2) some of the safeguards regarding the release of information that were noted by the *Doe* court are not provided;[26] and (3) a defendant must be made aware of the registration and notification requirements before entering a guilty plea to an enumerated offense, something apparently not required by the statute in *Doe.*

These differences, taken separately or cumulatively and viewed in light of the legislative history and the structural features indicating a regulatory purpose, do not demonstrate that the legislature acted with punitive intent when it adopted Public Acts 98–111 and 99–183.[27]

### B. *Punishment in Fact*

■ Next, it must be determined whether the statute, though intended to be regulatory or nonpunitive, is nevertheless so punitive in fact as to violate the ex post facto prohibition. This question is highly context specific. *See Doe,* 120 F.3d at 1275. Moreover, the plaintiff has a heavy burden of showing by "the clearest proof" that the statute is so punitive in form and effect as to render it criminal despite the legislature's intent to the contrary. *See Doe,* 120 F.3d at 1274. "[F]or the effects of a measure to render it 'punishment,' those effects must be extremely onerous.... The only examples the case law suggests of effects sufficiently onerous are

deprivation of one's United States citizenship that leaves one a 'stateless person' and a complete deprivation of personal freedom (i.e., incarceration)." *E.B. v. Verniero,* 119 F.3d 1077, 1101 (3d Cir.1997).

■ To guide inquiry at this stage, the Supreme Court and the Second Circuit have considered the factors identified in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), while recognizing that those factors are neither exhaustive nor dispositive. *See Doe,* 120 F.3d at 1275 (citing *Ward,* 448 U.S. at 249, 100 S.Ct. 2636).[28] Both courts have also recognized that the factors often point in different directions. *See Mendoza–Martinez,* 372 U.S. at 168, 83 S.Ct. 554; *Doe,* 120 F.3d at 1275.

Plaintiff contends that two of the *Mendoza–Martinez* factors show the CT–SORA to be punitive in fact: (1) the statute's registration requirements are triggered solely by the offender's conviction; and (2) Internet availability of registry data is unnecessary to achieve the statute's stated remedial purposes. Neither of these factors by itself, nor the two in combination, establishes by the "clearest evidence" that the law is punitive in fact.

■ *Tie to criminal conduct* The fact that the statute's registration requirements are triggered by an offender's conviction does not establish that the law is punitive in fact. *Doe* recognizes that such

---

**26.** Unlike the New York statute in *Doe,* the CT–SORA does not create a new criminal offense for misuse of registry information and does not require any identifying information from a member of the public prior to giving him or her access to the registry.

**27.** It bears noting that the individualized assessments in *Doe* and *Roe* were part of a system that involved significant, potentially mandatory proactive notification of victims, family, neighbors, employers, and at-risk groups.

Also, while a defendant who seeks to plead guilty must be informed of the potential punishment he could receive, it does not follow that every potential consequence brought to the defendant's attention is an element of

punishment. *See Cucciniello v. Keller,* 137 F.3d 721, 725 (2d Cir.1998) (recognizing that some "substantial consequences" of a guilty plea are not part of punishment and thus need not be noticed before the plea is taken, but suggesting that judicial officers might nevertheless find it advisable to give such notice).

**28.** The *Mendoza–Martinez* considerations are whether the sanction (1) involves an affirmative disability or restraint, (2) has historically been regarded as a punishment, (3) comes into play only on a finding of scienter, (4) will promote the traditional aims of punishment—retribution and deterrence, (5) applies to behavior that is already a crime, (6) may rationally be connected to an alternative, nonpunitive purpose, and (7) appears excessive in relation to that alternative purpose.

a trigger is common to all regulatory disabilities that follow from a prior conviction, such as the loss of the right to vote. *Doe* also recognizes that disabilities challenged under the Ex Post Facto Clause and upheld by the Supreme Court in several cases were triggered solely by a prior conviction. *See Doe,* 120 F.3d at 1281 (citing, among other cases, *Hawker v. People of New York,* 170 U.S. 189, 196–97, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (upholding law under which felony conviction was conclusive evidence of lack of fitness to practice medicine)).[29] *See also Cutshall v. Sundquist,* 193 F.3d 466, 476 (6th Cir. 1999) ("[A]lthough the registration and notification provisions are intertwined with the offender's underlying conviction, they impose no additional penalty . . . ."). Even in plaintiff's main case on this point, *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), the tie between the sanction and criminal conduct was only one of several factors that led the Supreme Court to conclude that the sanction was punitive. *See id.* at 780–83, 114 S.Ct. 1937. Elsewhere, the Court has found such a link insufficient to establish unconstitutionality. *See United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365–66, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); *Ward,* 448 U.S. at 250, 100 S.Ct. 2636.[30]

■ *Excessiveness* Plaintiff's argument that Internet dissemination is excessive relative to the goals of public safety and assisting law enforcement has some force. Connecticut's web site makes more information available to more people than is necessary to achieve its public safety and law enforcement goals.[31] Because Connecticut does not conduct an individualized assessment of each registrant, the web site conveys information about people who present either no risk or only a low risk of reoffending. Moreover, because the Internet is a global medium, the web site makes information available to millions of people who will never come to the state or otherwise come into contact with a registrant. As a result, Connecticut's approach is significantly different from the "occasionally imprecise targeting" that *Doe* ascribed to the New York statute. *See Doe,* 120 F.3d at 1282.

Nevertheless, I am not convinced that Connecticut's use of the Internet to disseminate registry data makes the CT–SORA punitive in fact. There can be no doubt that Internet availability of registry information is rationally related to the goals of public safety and law enforcement. *See Femedeer v. Haun,* 227 F.3d 1244, 1253 (10th Cir.2000). Indeed, use of the Internet is the most efficient means of making the information available to residents of the state, and it will become more efficient as Internet accessibility increases over time. Because use of the Internet furthers these nonpunitive purposes, this feature of the CT–SORA is insufficient to render the statute punitive in fact. *See United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996) ("Most significant is that [the challenged statutes], while perhaps having certain punitive aspects, serve important nonpunitive goals."); *E.B.,* 119 F.3d at 1097 ("The rele-

---

**29.** *Hawker* establishes that it is permissible to use a conviction as conclusive evidence that a sanction should apply, contrary to plaintiff's suggestion that the conviction may be used only as evidence in a subsequent proceeding.

**30.** It bears noting that application of the CT–SORA is not conditioned on scienter or a finding of criminal culpability. The CT–SORA applies not only to people who plead guilty to a covered offense or are convicted after trial, but also to people who plead nolo contendere or are found not guilty by reason of mental disease or defect. *See* C.G.S. §§ 54–250(1); 54–251; 54–252; 54–253; *see also Hendricks,* 521 U.S. at 362, 117 S.Ct. 2072 (finding significant the fact that people absolved of criminal culpability were still subject to the statute).

**31.** Defendants do not dispute that their web site also exceeds the availability requirements of the federal statute, which mandate that information be released only "where it is necessary to protect the public concerning a specific person." 42 U.S.C. § 14071(e)(2).

vant issue is whether [the notification provisions] are reasonably related to a legitimate goal.").

Plaintiff contends that Connecticut has an obligation to more closely tailor its notification system to the statute's regulatory purposes, relying principally on *Femedeer v. Haun,* 35 F.Supp.2d 852 (D.Utah 1999), which addressed a Utah web site providing Internet access to that state's registry.[32] The district court's decision in *Femedeer* has been reversed since plaintiff filed his memorandum. *See Femedeer v. Haun,* 227 F.3d 1244 (10th Cir.2000). Rejecting arguments very similar to those plaintiff makes here, the Tenth Circuit noted that "the district court [had] failed to consider ... that ... the farther removed one is from a sex offender's community and from Utah generally, the less likely one will be to have an interest in accessing" the Utah registry. *Id.* at 1253. The Tenth Circuit also accepted a significant degree of imprecision in Utah's system, declining to require a more rigorous risk assessment mechanism. *See id.* ("[A] statute is not necessarily excessive ... simply because a state has perhaps not achieved a perfect fit between ends and means.").

*Other Factors* None of the other *Mendoza–Martinez* factors supports a finding that the CT–SORA is punitive in fact. The burdens of registration and ongoing address verification are not the type of affirmative disability or restraint suggestive of a punitive sanction. *See Cutshall,* 193 F.3d at 474 ("The first [*Mendoza–Martinez*] factor, an affirmative disability or restraint, is some sanction approaching the infamous punishment of imprisonment." (citation and internal quotation omitted)); *cf. Hudson,* 522 U.S. at 104, 118 S.Ct. 488 (rejecting petitioners affirmative disability argument as "nothing approaching the 'infamous punishment' of imprisonment" (internal quotation omitted)).

As *Doe* pointed out, the Supreme Court has upheld civil sanctions with burdens much more onerous than those at issue here. *Doe,* 120 F.3d at 1279 (citing, inter alia, *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding involuntary civil commitment sanction against an Ex Post Facto Clause challenge)); *see also Seling v. Young,* —— U.S. ——, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (rejecting an "as applied" challenge to Washington's civil commitment statute).

Also, contrary to plaintiff's suggestion, "the fact that notification serves to deter sex offenders, both specifically and generally, from committing crimes in the future is not indicative of punitiveness." *Doe,* 120 F.3d at 1283; *see also Hudson,* 522 U.S. at 105, 118 S.Ct. 488 ("To hold that the mere presence of a deterrent purpose renders ... sanctions 'criminal' for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation ....").

*Aggregate assessment* Only two of the *Mendoza–Martinez* factors arguably indicate a punitive effect: the tie to criminal conduct and the excessiveness of the sanction relative to nonpunitive purposes. Neither one by itself is sufficient to overcome the legislature's nonpunitive intent. *See Hudson,* 522 U.S. at 101, 118 S.Ct. 488 (rejecting the Supreme Court's apparent prior elevation of the excessiveness factor to dispositive status); *One Assortment of 89 Firearms,* 465 U.S. at 365–66, 104 S.Ct. 1099 (holding that a punitive indication from the tie-to-criminal-conduct factor does not alone establish the necessary "clearest proof"); *Ward,* 448 U.S. at 249–50, 100 S.Ct. 2636 (same). Nor does the combined effect of these two factors suffice to establish by the clearest proof that the law is punitive in fact. Accordingly, defendants' motion for summary judgment on the ex post facto claim is granted.

**32.** Plaintiff's invocation of "other contexts" in which the Supreme Court has required that a sanction be more closely tailored to an individual's dangerousness is unpersuasive. *See* Pl.'s Mem. at 36. Each of the cases plaintiff cites involved physical detention or confinement.

*Conclusion*

In accordance with the foregoing, plaintiff's motion for summary judgment on the due process claim is granted and his motion as to the ex post facto claim is denied. Defendants' cross-motion for summary judgment as to the stigma aspect of the due process claim is denied and their cross-motion as to the ex post facto claim is granted. The ex post facto claim is dismissed.

So ordered.